1   DOUGLAS W. STERN (BAR NO. 82973)
    **FULBRIGHT & JAWORSKI L.L.P.**
2   555 South Flower Street
    Forty-First Floor
3   Los Angeles, CA 90071
    Telephone: (213) 892-9200
4   Facsimile: (213) 892-9494
    dstern@fulbright.com
5
    Attorneys for Cirrus Exploratory Sites, L.P.
6

7

8              IN THE UNITED STATES DISTRICT COURT **PJH**

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                   CV  07      6459

11  CIRRUS EXPLORATORY SITES, L.P., a  )   Civil Action No.
    Texas limited partnership,         )
12                                     )
                  Plaintiff,           )   **COMPLAINT FOR:**
13                                     )
         v.                            )   **(1)  DECLARATORY**
14                                     )        **RELIEF,**
    FIRST AMERICAN CORPORATION, a      )
15  California corporation, dba FIRST   )   **(2)  CONVERSION, AND**
    AMERICAN TITLE INSURANCE           )
16  COMPANY; HORTON-SHIPNUCK           )   **(3)  MONEY HAD AND**
    LIVING TRUST under agreement dated  )        **RECEIVED**
17  July 18, 2000, a California trust, DAVID )
    E. SHIPNUCK, trustee, of the HORTON- )
18  SHIPNUCK LIVING TRUST; LESLIE K.    )
    SHIPNUCK, an individual; and Does 1 )
19  through 25, inclusive,             )
                                       )
20                Defendants.          )

21

22

23       Plaintiff The Cirrus Exploratory Sites, L.P. alleges as follows:

24       1.    This action arises out of a real estate transaction. Ultimately, Plaintiff

25  sought to become an assignee of the purchaser of the real estate. However,

26  conditions that had to be performed in order for the Plaintiff to become the

27  substituted purchaser of the real property were never met, and Plaintiff never

28  became a party to the transaction. Although Plaintiff never became a party to the

DOCUMENT PREPARED
ON RECYCLED PAPER

ORIGINAL

70169127.1                           - 1 -

1  transaction, the escrow company, First American Title Insurance Co. has refused to

2  return to Plaintiff the sum of $212,500 plus interest, which the Plaintiff had

3  delivered to it.  The sellers of the real property have refused to authorize the escrow

4  company to release the funds, even though they refused to perform the express

5  conditions necessary for the assignment.  Plaintiff seeks the return of the funds it

6  paid into escrow, along with interest, damages, punitive damages, and other

7  appropriate relief.

8

9  **The Parties and Jurisdiction**

10      2.     Plaintiff Cirrus Exploratory Sites, LP, is a Texas limited partnership,

11  with its principal place of business located in Dallas, Texas.

12      3.     Defendant First American Corporation, dba First American Title

13  Insurance Company, is a corporation organized under the laws of the State of

14  California, with its principal place of business located in Orange County,

15  California.  (Defendant shall be referred to herein as "First American Title".)

16      4.     Defendant the Horton-Shipnuck Living Trust under agreement dated

17  July 18, 2000 is an entity believed to be created under the laws of the State of

18  California, with its principal place of business located in the County of Sonoma,

19  California.

20      5.     Defendant David E. Shipnuck is believed to be a resident of Monterey

21  County, California, and is the trustee of the Horton-Shipnuck Living Trust.

22      6.     Defendant Leslie K. Shipnuck is believed to be a resident of Alameda

23  County, California.

24      7.     Plaintiff is ignorant of the true names and identities of those

25  Defendants sued herein as Does 1 through 25, inclusive.  Plaintiff will amend this

26  complaint to set forth the true names and identities of these Defendants when such

27  is determined.  Such Defendants are believed to be citizens of the State of

28  California.  Plaintiff is informed and believes, and on that basis alleges that each of

1 | the Defendants sued herein as Does 1 through 25 is responsible in whole or in part
2 | for the actions alleged herein.  Further, Plaintiff is informed and believes, and on
3 | that basis alleges that the Defendants sued herein as Does 1 through 25 claim an
4 | interest to all or a portion of the funds deposited by Plaintiff with First American
5 | Title.
6 |       8.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as there is
7 | diversity of citizenship between the parties, and the amount in controversy,
8 | exclusive of interest and costs exceeds $75,000.
9 |
10 | **Facts Relating to the Underlying Transaction**
11 |       9.     On or about June 10, 2005, The Horton-Shipnuck Living Trust, David
12 | E. Shipnuck, trustee, and Leslie K. Shipnuck, an individual, as sellers, entered into
13 | a written contract titled "Purchase and Sale Agreement" (hereinafter referred to as
14 | the "Purchase Agreement") wherein the Horton-Shipnuck Living Trust and Leslie
15 | Shipnuck agreed to sell to the Greenwood Revocable Trust a 23.47 acre parcel of
16 | real property identified as 20425 Eighth Street East, Sonoma, California.  The real
17 | property is referred to hereinafter as the "Sonoma Property."
18 |       10.    Thereafter, the parties to the Purchase Agreement established an
19 | escrow for the purchase transaction which was opened with Defendant First
20 | American Title, as Escrow No. 1960545.
21 |       11.    Pursuant to the terms of the Purchase Agreement, escrow was to close
22 | on about October 10, 2005.  On or about November 15, 2005 Horton-Shipnuck
23 | Living Trust, and Leslie K. Shipnuck as sellers, and the Greenwood Revocable
24 | Trust as buyer, agreed to extend the date for the close of escrow until May 10,
25 | 2006.
26 |       12.    Thereafter, on about January 26, 2006, Horton-Shipnuck Living Trust,
27 | and Leslie K. Shipnuck as sellers, and the Greenwood Revocable Trust as buyer,
28 | agreed to extend the date for the close of escrow until 30 days after the completion

1    of an election for the annexation of the Sonoma Property into the Sonoma Valley

2    Sanitation District.  This extension agreement provided that the election was to be

3    completed in 2006.  It further provided that the Greenwood Revocable Trust would

4    pay $212,500 at the expiration of that time, and in no event later than December 15,

5    2006.  The purchase date would be extended one year as a result of that extension.

6        13.    Effective December 1, 2005, the Greenwood Revocable Trust assigned

7    to the Elizabeth G. Frazier Revocable Trust its interest in the Purchase Agreement

8    as the buyer.

9

10    **The Attempted Assignment to Plaintiff**

11        14.    On or about December 14, 2006, the Elizabeth G. Frazier Revocable

12    Trust as the buyer under the Purchase Agreement entered into a written agreement

13    titled "Agreement Regarding Contract" with Plaintiff Cirrus Exploratory Sites, LP

14    whereby Plaintiff Cirrus Exploratory Sites, LP conditionally agreed to become the

15    assignee of the buyer, Elizabeth G. Frazier Revocable Trust.  A true and correct

16    copy of the "Agreement Regarding Contract" is attached hereto as Exhibit 1.

17        15.    Under the terms of the "Agreement Regarding Contract" the

18    assignment would take place only if certain conditions were met and agreed to by

19    Horton-Shipnuck Living Trust, David E. Shipnuck, trustee, and Leslie K. Shipnuck,

20    as sellers.

21        16.    In particular the "Agreement Regarding Contract" provided for a

22    closing on the Assignment provided that:

23            "At the Closing [on the Assignment set for December 15,
2006] EGF [Elizabeth G. Frazier Revocable Trust] shall

24    deliver to Cirrus (i) the Assignment, executed by EGF and
the Seller [Horton-Shipnuck Living Trust, David E.

25    Shipnuck, trustee, and Leslie K. Shipnuck] in the form
attached hereto as Exhibit D and (ii) a counterpart of the

26    Development Agreement, executed by EGF …"

27        17.    The "Agreement Regarding Contract" provided that time was of the

28    essence with regard thereto.

1 | <u>**The Express Conditions Necessary for the**</u>

2 | <u>**Creation of the Assignment Escrow**</u>

3      18.    Pursuant to the express requirement of the "Agreement Regarding

4 Contract," a document titled "Assignment of Purchase and Sale Agreement" was

5 prepared and submitted to Defendant First American Title on December 14, 2006,

6 so that it could obtain the signatures of the sellers on the "Assignment of Purchase

7 and Sale Agreement." A true and correct copy of the "Assignment of Purchase Sale

8 Agreement" is attached hereto as Exhibit 2.

9      19.    As part of the "Assignment of Purchase and Sale Agreement" and

10 before there was a completed assignment, the sellers were required to expressly

11 represent and warrant to Plaintiff Cirrus Exploratory Sites, LP, that:

12     "(i) attached as Exhibit A is a true, correct and complete copy of
the Contract; (ii) the Contract is valid and in full force and

13     effect; (iii) the Contract has not been modified, amended or
altered in any way, except as provided by the Extension

14     Agreements; (iv) Assignor is not in default under the Contract;
and (v) there are no other parties in possession of the Property,

15     except for two month-to-month leases."

16     These express representations and warranties were material to the assignment

17 transaction and a necessary pre-condition to the assignment.

18      20.    On December 14, 2006, Plaintiff Cirrus Exploratory Sites, LP, through

19 its legal counsel, transmitted to First American Title its letter of instruction

20 directing that First American Title evidence its agreement to become escrow holder

21 for the funds and documents tendered by Plaintiff upon the terms set forth therein,

22 by signing and returning the instruction letter to Plaintiff. (A true and correct copy

23 of the December 14, 2006 letter is attached hereto as Exhibit 3.) Upon becoming

24 escrow holder, First American Title was authorized to act only upon certain express

25 conditions. The letter of instruction stated:

26     "Our client [Cirrus Exploratory Sites, LP] is wire transferring to
your escrow account the sum of $212,500.00 to be distributed to

27     Seller upon the occurrence of the following:

28      1.    Receipt by you of a counterpart of each of the foregoing

documents executed by Assignor:

2.  Receipt by you of a counterpart of the Assignment executed by Seller: and

3.  Receipt by you of instructions from the undersigned or a representative of the Assignee to disburse and distribute the documents.

Upon your receipt of the foregoing documents and funds, you are instructed to hold the same in escrow, notify me by e-mail and await further instructions from me or from a representative of Assignee."

21.  Notwithstanding the express requirement that First American Title sign and return the instruction letter, thereby evidencing its acceptance of the terms upon which the funds and documents were tendered by Plaintiff, Plaintiff never received a signed copy of the instruction letter.

22.  Plaintiff is informed and believes, and on that basis alleges that First American Title submitted to Horton-Shipnuck Living Trust, David E. Shipnuck, trustee, and Leslie K. Shipnuck, the "Assignment of Purchase and the Sale Agreement" for them to execute as sellers of the Sonoma Property.

23.  Notwithstanding the express requirement that the sellers, Horton-Shipnuck Living Trust, David E. Shipnuck, trustee, and Leslie K. Shipnuck, sign the "Assignment of Purchase and Sale Agreement," the signatures of both of the sellers was never obtained and Plaintiff never became a party to the transaction.

24.  Notwithstanding the express requirement that First American Title hold the funds of Plaintiff subject to instructions to be provided by Plaintiff, the only instructions provided to First American Title were written instructions to terminate the escrow.  First American Title refused to honor those instructions.

## The Sellers Response

25.  On or about February 14, 2007, John A. Kelly, as legal counsel for sellers Horton-Shipnuck Living Trust, David E. Shipnuck, trustee, and Leslie K. Shipnuck, notified Plaintiff that sellers could not unconditionally meet the express

1    terms set forth in the December 14, 2006 letter of instruction identified in paragraph

2    19 above and the "Assignment of Purchase and Sale Agreement." (A true and

3    correct copy of the February 14, 2007 letter is attached hereto as Exhibit 4.) In

4    particular, he stated that there were certain exceptions to their representation and

5    warranty that Exhibit A was a true and correct copy of the Contract. He noted that

6    the size of the property was not approximately 24 acres, but was closer to 22 acres.

7    Counsel for sellers indicated that sellers could not represent and warrant that the

8    Contract was valid and in full force and effect, as the precise terms of the option

9    had not been met with respect to the deposit.

10       26.    In his letter of February 14, 2007, counsel for sellers, introduced an

11   entirely new and different term with respect to the proposed purchase of the

12   Sonoma Property. In particular, the sellers asserted that it was the position of the

13   City Attorney of the City of Sonoma that should the property be annexed into the

14   City of Sonoma the property would be limited in use to a "medical campus." As a

15   result of the this new matter, the sellers requested a materially different agreement

16   which would require the Plaintiff Assignee to complete the purchase the Sonoma

17   Property. This was a material new term, as under the then existing Purchase

18   Agreement, the Assignee buyer had the right, but not the obligation to purchase the

19   Sonoma Property.

20       27.    Counsel for the sellers, concluded by indicating that "With the

21   exception of these issues, the Sellers are prepared to acknowledge, agree, represent,

22   and warrant, as indicated. If this will prove acceptable to your client, please let me

23   know as soon as is reasonably possible." This was not acceptable to Plaintiff.

24

25                **Plaintiff's Demand for Return of its Funds**

26       28.    On April 17, 2007, having never received a signed copy of the

27   December 14, 2006 letter agreement executed by First American Title evidencing

28   its agreement to serve as an escrow holder pursuant to the terms set forth therein,

1    having never received an executed "Assignment of Purchase and Sale Agreement"

2    bearing the signatures of both sellers, and having never agreed to the

3    counterproposal set forth in the sellers' letter of February 14, 2007, Plaintiff

4    notified the Elizabeth G. Frazier Revocable Trust, and First American Title that

5    Plaintiff demanded the immediate refund of the $212,500 which it had transferred

6    to First American Title.

7          29.    First American Title never refunded to Plaintiff the funds that it had

8    the delivered to First American Title in the amount of $212,500, or any other

9    amount.

10         30.    On or about November 29, 2007, Plaintiff, through legal counsel,

11    again demanded the return to Plaintiff of its deposit of $212,500.

12         31.    On or about December 9, 2007, John A. Kelly, counsel for sellers

13    notified First American Title that they refused to authorize First American Title to

14    distribute the funds to Plaintiff.

15

16                       **First Claim for Relief**

17            **[Declaratory Relief against all Defendants]**

18         32.    Plaintiff incorporates herein by reference the allegations contained in

19    paragraphs 1 through 31, inclusive.

20         33.    A genuine controversy exists between Plaintiff's and Defendants and it

21    is appropriate to obtain from the court a declaration of Plaintiff's rights or duties

22    with respect to the matters asserted herein.

23         34.    Plaintiff contends that it is entitled to the return of $212,500 delivered

24    by it to First American Title, and that it has no obligation to sellers or anyone else

25    under any of the agreements identified herein.

26         35.    Plaintiff is informed and believes, and on that basis alleges that

27    Defendant sellers dispute the contention of Plaintiff, and instead claimed that they

28    are entitled to all or a portion of the funds paid to First American Title by Plaintiff.

1    36.    Plaintiff is informed and believes, and on that basis alleges that

2    notwithstanding the fact that First American Title failed to execute the December

3    14, 2006 instruction letter, evidencing its agreement to serve as the escrow holder

4    with respect to the assignment, and notwithstanding the fact that the express

5    conditions set forth in the December 14, 2006 instruction letter for there to be an

6    escrow were never met, that First American Title nonetheless claims that it has the

7    right to retain the funds that Plaintiff delivered to First American Title.

8    37.    Plaintiff is entitled to the judgment of this court that First American

9    Title must deliver to Plaintiff its payment plus interest thereon.  Plaintiff is also

10    entitled to the judgment of this court that seller Defendants have no right, title or

11    interest to any portion of the Plaintiff's payment held by First American Title.

12

13    **Second Claim for Relief**

14    **[Conversion against all Defendants]**

15    38.    Plaintiff incorporates herein by reference the allegations contained in

16    paragraphs 1 through 31, inclusive.

17    39.    Plaintiff is the owner of $212,500 it delivered to First American Title.

18    40.    The letter of December 14, 2006, contained express conditions upon

19    which First American Title was to hold the funds delivered concurrently to First

20    American Title.  First American Title had no right to possession of the funds if it

21    was not able to meet the express conditions set forth in the letter of December 14,

22    2006.

23    41.    Among the conditions contained in the December 14, 2006 instruction

24    letter was the condition that First American Title execute the instruction letter

25    agreeing to serve as escrow holder with respect to the assignment.  First American

26    Title never executed the December 14, 2006 instruction letter.

27    42.    The conditions set forth in the December 14, 2006 letter, including the

28    condition that First American Title obtain from sellers the executed "Assignment of

Purchase and Sale Agreement" were not met, and thus First American Title never became an escrow holder with respect to the attempted assignment to Plaintiff, and First American Title was not entitled to continue to hold the $212,500 delivered to it by Plaintiff.

43.    Demand for repayment of the amount of $212,500 was made on April 17, 2007. First American Title has wrongfully refused to return the money and wrongfully withheld from Plaintiff the sum of $212,500 plus interest, since that date.

44.    Defendant First American Title has continued to refuse to return to Plaintiff its $212,500, notwithstanding demand by Plaintiff that the amount be returned to it. Plaintiff is entitled to immediate possession of the money.

45.    First American Title has known at all times that it had not executed the December 14, 2006 instruction letter, and had never agreed to serve as an escrow holder with respect to the attempted assignment. First American Title knew that it had never obtained from the sellers the executed "Assignment of Purchase and Sale Agreement" and that hence an express condition for escrow had not been met. Notwithstanding this knowledge it nonetheless refused to deliver to Plaintiff the funds belonging to Plaintiff.

46.    Defendant sellers have a wrongfully asserted their right to all or a portion of the $212,500 belonging to Plaintiff and wrongfully exercised dominion over that asset. Defendant sellers knew at all times that they had not executed the "Assignment of Purchase and Sale Agreement" and that they had expressly refused to comply with the requirements of the "Assignment of Purchase and Sale Agreement." Defendant sellers knew that they had demanded a material change to the terms of the "Purchase Agreement." Notwithstanding these facts, sellers wrongfully asserted that they were entitled to all or a portion of Plaintiff's funds, and wrongfully prevented Plaintiff from obtaining its funds.

DOCUMENT PREPARED
ON RECYCLED PAPER

47.    Defendant sellers have wrongfully conspired and acted in concert with First American Title in directing it to continue to withhold from Plaintiff Plaintiff's money.

48.    Plaintiff has been damaged by the actions of the Defendants in the amount of $212,500 plus interest thereon.

49.    The actions of Defendants have been oppressive, fraudulent and malicious and done with an intent to inflict harm upon Plaintiff.  Plaintiff is entitled to the award of punitive damages.

## Third Claim for Relief

### [Money Had and Received against First American Title
### and Does 1 through 25]

50.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 31, inclusive.

51.    Within the last two years, on or about December 14, 2006, Defendant First American Title became indebted to Plaintiff in the sum of $212,500.00 for money had and received by the Defendant for the use and benefit of Plaintiff.

52.    Plaintiff has repeatedly made demand upon Defendant First American Title for the payment to it of the funds.  The last demand was made on or about November 26, 2007.

53.    No payment has been made by Defendant First American Title to Plaintiff of all or any portion of said funds, and there is now due and owing the sum of $212,500.00 plus interest on that amount from December 14, 2006 at the legal rate of interest.

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For a declaration that Plaintiff is entitled to the return of the funds it delivered to First American Title and that no Defendant has any rights with respect to all or a portion of said amount.

1    2.    For damages according to proof, believed to be in the amount of

2    $212,500 plus interest thereon;

3    3.    For interest on all such amounts due Plaintiff;

4    4.    For punitive damages;

5    5.    For costs of suit herein; and

6    6.    For such other and further relief as court deems just and proper.

7

8    Dated:        December 20, 2007        DOUGLAS W. STERN
                                            **FULBRIGHT & JAWORSKI L.L.P.**

9

10

11                                         By _____

12                                            DOUGLAS W. STERN
                                            Attorneys for Plaintiff Cirrus Exploratory
13                                          Sites, L.P.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

## AGREEMENT REGARDING CONTRACT

THIS AGREEMENT REGARDING CONTRACT ("Agreement') is executed as of the ___ day of December, 2006, by and among Cirrus Exploratory Sites, LP, a Texas limited partnership ("Cirrus"), Elizabeth G. Frazier, Revocable Trust dated Jan. 9th 2004 ("EGF") and Sonoma Health Institute, a California Limited Liability Company ("SHI").

### R E C I T A L S

1.        EGF, as Buyer, entered into that certain Purchase and Sale Agreement with David E. Shipnuck, as trustee of the Horton-Shipnuck Living Trust under agreement dated July 18, 2000 and Leslie K. Shipnuck, as Seller ("Seller"), dated effective as of June 10, 2005 (the "Original Contract"), for the purchase and sale of approximately 23.47 acres of land situated in Sonoma, Sonoma County, California ("Property"), a copy which is attached hereto as Exhibit A.

2.        EGF and Seller entered into that certain (a) that certain Extension Agreement dated November 15, 2005; and (b) that certain Modification of Extension Agreement dated January 26, 2006 (collectively, the "Extension Agreements"; the Original Contract with the Extension Agreements, the "Contract"), amending the Original Contract as provided therein, copies of which are attached hereto as Exhibit B.

3.        Cirrus desires to purchase the Contract and acquire the Property for the purpose of developing a health care campus, consisting of a hospital, medical office building and related facilities (the "Project"), and EGF desires to assign the Contract to Cirrus upon the terms and conditions hereinafter set forth.

4.        SHI desires to acquire up to 50% of the Property for the purpose of developing a Medical Health spa ("Medical Spa Site"), and Cirrus is willing to convey the Medical Spa Site to SHI upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, for good and valuable consideration described below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.        Purchase and Assignment of Contract. EGF agrees to assign and Cirrus agrees to purchase the Contract from EGF for the sum of Three Million Seven Hundred Twenty-Five Thousand and No/100 Dollars ($3,725,000.00) to be paid by Cirrus by means of a cash payment in the amount of $325,000.00 ("Cash Payment") and a promissory note in the amount of $3,400,000 (the "Note"). The Cash Payment shall be made according to the provisions of paragraph 2.1 of the Development Agreement attached hereto as Exhibit C. The Note shall be executed and delivered by Cirrus to 1st American Title Company, Sonoma, CA upon the closing of the purchase by Cirrus of the Property ("Property Closing"), at which time it shall be transferred to EGF. The Note shall bear interest at the rate of 12% per annum, accruing from the date on which the hospital portion of the Project opens for business, and interest-only shall be payable on a monthly basis, with the principal balance of the Note and accrued interest thereon,

1

being payable in full on the 12th anniversary of the Closing. The Note shall be in a form reasonably acceptable to Cirrus and EGF. Payment of the Note shall be secured by a deed of trust on the Property (the "Deed of Trust), the form of which shall be reasonably acceptable to Cirrus and EGF and shall be subordinate to any liens securing debt financing obtained by Cirrus to develop the Project, as well as any other requirements of the lender providing such financing. Cirrus may prepay the Note at any time without premium or penalty. If Cirrus is unable to obtain the Approvals described in Section 1.3 of the Development Agreement, the Note will be extinguished and the Deed of Trust released. If Cirrus is unable to obtain the Approvals but builds the medical office building, the principal amount of the Note will be reduced by 50%.

2.    Payment to Seller. At Closing, Cirrus shall wire transfer to Seller the sum of $212,500.00 as a non-refundable payment to extend the "contingency date" under the Contract for period of one (1) year from the date hereof.

3.    Closing. The closing ("Closing") of the purchase and assignment of the Contract shall occur on or before December 15, 2006 in the offices of 1st American Title Company, Sonoma CA 95476. At the Closing, EGF shall deliver to Cirrus (i) the Assignment, executed by EGF and the Seller in the form attached hereto as Exhibit D and (ii) a counterpart of the Development Agreement, executed by EGF and Cirrus shall (i) shall deliver to EGF an executed counterpart of the Development Agreement and (ii) make the payment to Seller required by Section 2 hereof.

4.    Medical Spa Site. Upon the Property Closing, Cirrus, for no additional consideration, shall convey to SHI up to fifty percent (50%) of the Property, the exact number of square feet and location of which is to be agreed upon by Cirrus and SHI prior to the Property closing, taking into consideration the compatibility of the size and location of the Medical Spa Site with the hospital and medical office building elements of the health care campus. SHI shall pay 50% of all costs associated with the conveyance to it of the Medical Spa Site. The site development costs related to the Medical Spa Site shall be shared equally by Cirrus and Sonoma Health Institute.

5.    Sale of Property. As provided in Section 2.3 of the Development Agreement, in the event that Cirrus is unable to obtain the Approvals as set forth in Paragraph 1 above, Cirrus and SHI shall engage in a cooperative, good faith effort to sell the remaining portion of the Property and the Medical Spa Site and share, equally, the proceeds from any such sale, following reimbursement of Cirrus and SHI of the costs incurred by each with respect to the Property.

6.    Miscellaneous Provisions.

a.    The prevailing party in any legal proceeding brought under or with relation to this Agreement or transaction, such party shall be entitled to recover court costs, reasonable attorney's fees, and all other litigation expenses from the non-prevailing parties.

b.    This Agreement contains the complete agreement between the parties with respect to the Contract and cannot be varied except by written agreement. The parties

2

agree that there are no oral agreements, understanding, representations or warranties signed by the parties which are not expressly set forth herein.

c.    Any warranty, representation, covenant or condition contained in this Contract shall be deemed to be remade as of the Closing and will survive the closing of this transaction as a continuing agreement by and between the parties.

d.    This Agreement shall inure to the benefit of and bind the parties hereto and their respective heirs, legal representatives, successors and assigns.

e.    Time is of the essence of this Agreement and each provision hereof.  Strict compliance with the times for performance is required.

f.    If any date of performance hereunder falls on a Saturday, Sunday or legal holiday, such date shall be deferred to the next day which is not a Saturday, Sunday or legal holiday.

g.    This Agreement shall be construed under and governed by the laws of the State of California, and unless otherwise provided herein, all obligations of the parties created hereunder are performable in the county where the Property is located.

h.    In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision is severed and deleted from this Agreement.

i.    This Agreement may be executed in a number of identical counterparts. Each such counterpart is deemed an original for all purposes and all such counterparts shall, collectively, constitute one agreement, but, in making proof of this Agreement, it shall be necessary to produce or account for more than one counterpart.

**[The Signature Page Follows]**

3

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the 14th day of December, 2006.

CIRRUS EXPLORATORY SITES, LP,
a Texas limited partnership

By:    Cirrus Exploratory Sites Manager, LLC,
       a Texas limited liability company
       its general partner

       By:    _____
              Donald C. Wilson, Manager

ELIZABETH G. FRAZIER REVOCABLE TRUST
DATED JANUARY 9, 2004

By:    _____
       Elizabeth G. Frazier, Trustee

SONOMA HEALTH INSTITUTE
a California limited liability company

By:    _____
       Henry Grause, Manager

06400.201/D05

4

# EXHIBIT 2

# ASSIGNMENT OF
# PURCHASE AND SALE AGREEMENT

THIS ASSIGNMENT OF PURCHASE AND SALE AGREEMENT (this "Assignment") is entered into by and between ELIZABETH G. FRAZIER REVOCABLE TRUST (the "Assignor"), and CIRRUS EXPLORATORY SITES, LP, a Texas limited partnership (the "Assignee").

WHEREAS, GREENWOOD REVOCABLE TRUST ("GRT"), as Buyer, entered into that certain Purchase and Sale Agreement with David E. Shipnuck, as trustee of the Horton-Shipnuck Living Trust under agreement dated July 18, 2000 and Leslie K. Shipnuck, as Seller ("Seller"), dated effective as of June 10, 2005 (the "Original Contract"), for the purchase and sale of approximately 23.47 acres of land situated in Sonoma, Sonoma County, California ("Property"), a copy which is attached hereto as Exhibit A; and

WHEREAS, GRT and Seller entered into that certain (a) that certain Extension Agreement dated November 15, 2005; and (b) that certain Modification of Extension Agreement dated January 26, 2006 (collectively, the "Extension Agreements"; the Original Contract with the Extension Agreements, the "Contract"), amending the Original Contract as provided therein, copies of which are attached hereto as Exhibit B;

WHEREAS, GRT has assigned its interest in the Contract to Assignor, pursuant to an Assignment effective as of December 1, 2005, a copy of which is attached hereto as Exhibit C; and

WHEREAS, Assignor has agreed to assign to Assignee and Assignee has agreed to accept, Assignor's right, title and interest in and to the Contract;

NOW, THEREFORE, for good and valuable consideration described in the Agreement Regarding Contract executed and dated December 14, 2006 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns to Assignee, its successors and assigns, all of Assignor's right, title and interest in and to the Contract.

Assignee hereby assumes all of Assignor's obligations under the Contract, and agrees to defend, indemnify and hold harmless Assignor from and against all claims, fines, judgments, settlements, damages, losses, costs, expenses and attorneys' fees arising out of, resulting from or related in any way whatsoever to the obligations under the Contract assumed by Assignee.

Assignor agrees to defend, indemnify and hold harmless Assignee from and against all claims, fines, judgments, settlements, damages, losses, costs, expenses and attorneys' fees arising out of, resulting from or related in any way whatsoever to Assignor's obligations under the Contract prior to the date hereof.

Seller, by its joinder and execution below, acknowledges consents to the assignment of the Contract to and assumption of the Contract by Assignor and the assignment of the Contract to

and assumption of the Contract by Assignee.  In connection with this Assignment this Assignment, Seller hereby represents and warrants the following to Assignee: (i) attached as <u>Exhibit A</u> is a true, correct and complete copy of the Contract; (ii) the Contract is valid and in full force and effect; (iii) the Contract has not been modified, amended or altered in any way, except as provided by the Extension Agreements; (iv) Assignor is not in default under the Contract; and (v) there are no other parties in possession of the Property, except for two month-to-month leases.

By its execution below, Seller hereby acknowledges that pursuant to the terms of that certain Modification of Extension Agreement dated January 26, 2006, and contemporaneously with the execution and delivery of this Assignment, Assignee has delivered the sum of Two Hundred Twelve Thousand Five Hundred Dollars ($212,500.00) by wire transfer as a non-refundable payment to exercise Assignee's right to extend the "contingency date" under the Contract for one (1) year from the date hereof.

IN WITNESS WHEREOF, the parties have executed and delivered this Assignment as of the 15th day of December, 2006.

**ASSIGNEE:**

CIRRUS EXPLORATORY SITES, LP
a Texas limited partnership

By:   Cirrus Exploratory Sites Manager,
     LLC,
     a Texas limited liability company,
     its general partner

By:   _____
     W.L. Hutchison, Jr., Manager

**ASSIGNOR:**

ELIZABETH G. FRAZIER REVOCABLE
TRUST DATED JANUARY 9. 2004

By:   _____
     Elizabeth G. Frazier, Trustee

**ACKNOWLEDGED AND AGREED BY SELLER:**

_____
David E. Shipnuck, as Trustee
of the Horton-Shipnuck Living Trust
under agreement dated July 18, 2000

_____
Leslie K. Shipnuck

06400 201/D03 3

and assumption of the Contract by Assignee.    In connection with this Assignment this Assignment, Seller hereby represents and warrants the following to Assignee: (i) attached as Exhibit A is a true, correct and complete copy of the Contract; (ii) the Contract is valid and in full force and effect; (iii) the Contract has not been modified, amended or altered in any way, except as provided by the Extension Agreements; (iv) Assignor is not in default under the Contract; and (v) there are no other parties in possession of the Property, except for two month-to-month leases.

By its execution below, Seller hereby acknowledges that pursuant to the terms of that certain Modification of Extension Agreement dated January 26, 2006, and contemporaneously with the execution and delivery of this Assignment, Assignee has delivered the sum of Two Hundred Twelve Thousand Five Hundred Dollars ($212,500.00) by wire transfer as a non-refundable payment to exercise Assignee's right to extend the "contingency date" under the Contract for one (1) year from the date hereof.

IN WITNESS WHEREOF, the parties have executed and delivered this Assignment as of the 14th day of December, 2006.

**ASSIGNEE:**

CIRRUS EXPLORATORY SITES, LP
a Texas limited partnership

By:    Cirrus Exploratory Sites Manager,
       LLC,
       a Texas limited liability company,
       its general partner


       By:    _____
              Don C. Wilson, Manager


**ASSIGNOR:**

ELIZABETH G. FRAZIER REVOCABLE
TRUST DATED JANUARY 9. 2004

By:    _____
       Elizabeth G. Frazier, Trustee


**ACKNOWLEDGED AND AGREED BY SELLER:**


_____
David E. Shipnuck, as Trustee
of the Horton-Shipnuck Living Trust
under agreement dated July 18, 2000


_____
Leslie K. Shipnuck

# EXHIBIT A

(Contract)

# PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (Agreement) is made as of June 10, 2005 (Effective Date), between DAVID E. SHIPNUCK, as trustee of the Horton-Shipnuck Living Trust under agreement date July 18, 2000, and LESLIE K. SHIPNUCK, an individual (collectively referred to as Seller), and GREENWOOD REVOCABLE TRUST, a trust (Buyer).

## RECITALS

A. Seller is the owner of certain real property located in the vicinity of Sonoma, County of Sonoma, State of California, consisting of a 23.47-acre parcel of land, commonly known as 20425 Eighth Street East, Sonoma, California, 95476, with Assessor's parcel number 126-011-045, which is more particularly described in Exhibit A (Land), and the related improvements, appurtenances, and certain related personal and intangible property.

B. The Land is improved by a single family residence, various small outbuildings and former chicken coops.

C. Seller desires to sell and Buyer desires to purchase the Property, including the Land and the Building, as specifically described below.

## ARTICLE 1

## AGREEMENT OF SALE

1.1. Purchase and Sale. For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller agrees to sell and Buyer agrees to purchase all Property described below in section 1.2, under the terms and conditions of this Agreement.

1.2. Description of the Property. The property to be sold and purchased under this Agreement (Property) consists of the following:

1.2.1. Land. As described in Exhibit A.

1.2.2. Appurtenances. All privileges, rights, easements appurtenant to the Land, including without limitation all minerals, oil, gas, and other hydrocarbon substances on and under the Land; all development rights, air rights, water, water rights, and water stock relating to the Land; all right, title, and interest of Seller in and to any streets, alleys, passages, water and sewer taps, sanitary or storm drain capacity or reservations

Page 1 of 26

included in, adjacent to or used in connection with the beneficial use and enjoyment of the Land (collectively, the Appurtenances).

    1.2.3. <u>Improvements.</u> All buildings, structures, fences, parking areas, or improvements located upon the Land or upon the Improvements, including fixtures, systems, and equipment attached to the Land or Improvements and used in connection with the operation or occupancy of the Land and Improvements (such as heating and air-conditioning systems, refrigeration, ventilation, garbage disposal, or utility conduits) (collectively, the Improvements, which together with the Land and the Improvements are called the Real Property).

    1.2.4. <u>Personal Property.</u>  No tangible personal property is to be transferred.

## ARTICLE 2

## PURCHASE PRICE

    2.1. <u>Amount.</u> The full purchase price (Purchase Price) for the Property is Three Million Five Hundred Thousand Dollars ($3,500,000.00).

    2.2. <u>Deposits.</u> Within three (3) Business Days after the Effective Date, as a deposit against the Purchase Price, Buyer must deposit Twenty-Five Thousand Dollars ($25,000.00 - Initial Deposit) into an escrow (Escrow) to be opened with FIRST AMERICAN TITLE COMPANY (Escrow Holder).

    2.3. <u>Payment of Balance.</u> Buyer agrees to pay, or cause to be paid, the balance of the Purchase Price to Seller through the Escrow by depositing cash or a certified or cashier's check payable to the Escrow Holder, or by electronic transfer of federal funds, which shall be delivered to the Escrow Holder at least one (1) business day before the Closing Date.

## · ARTICLE 3

## BUYER'S CONTINGENCIES

    3.1. <u>Seller's Delivery of Documents.</u> Buyer's obligation to purchase the Property is expressly conditioned on Seller's delivering to Buyer all documents listed below (collectively, Preliminary Documents). Failure to deliver the Preliminary Documents within thirty (30) days after the Effective Date will extend the Contingency Date (as defined in section 3.2 by one day for every one day thereafter that the last such Preliminary Document is delivered.

    3.1.1. <u>Preliminary Report.</u> A preliminary report (Preliminary Report) covering the Real Property and issued by FIRST AMERICAN TITLE COMPANY (Title Company),

together with a legible copy of all exceptions to title shown in the Preliminary Report, including each document, map, and survey referred to in the Preliminary Report.

3.1.2. Surveys. A boundary survey of the Real Property.

3.1.3. Agreements. Copies of all written easements, covenants, restrictions, agreements, service contracts, and other documents that affect the Property, including without limitation any agreements relating to insurance, service, operation, repair, supply, advertising, promotion, sale, leasing, or management of the Property or the use of the common facilities.

3.1.4. Licenses and Permits. Copies of any licenses, permits, or certificates required by governmental authorities in connection with construction or occupancy of the Improvements, including without limitation building permits, certificates of completion, certificates of occupancy, and environmental permits and licenses, and any correspondence related to the Improvements.

3.1.7. Plans. Copies of any existing construction drawings, as-built plans, and specifications for the Property.

3.1.8. Rent Roll. A rent roll, dated no earlier than fifteen (15) days before the Effective Date (Rent Roll).

3.1.9. Leases. Copies of all Leases (and any modifications or amendments to them) with all tenants of the Property (Leases), and any correspondence related to the Leases, including all statements from retail tenants of their sales.

3.1.10. Leasing Commission Agreements. A complete list of all agreements for leasing commissions payable on the Leases and renewals of or options on the Leases and copies of all such written agreements.

3.1.11. Materials Related to Condition of the Property. Any environmental impact reports, "Phase I" or "Phase II" reports, or environmental site assessments concerning hazardous materials on the Property, complaints or notices of the presence of hazardous materials on the Property, geological surveys, soil tests, engineering reports, inspection results, complaints, or notices received regarding the safety of the Property.

3.1.12. Litigation Materials. All materials related to pending or threatened litigation, or litigation that was pending or threatened during the period of Seller's ownership of the Property, involving the Property or the Seller on account of its ownership of the Property, including correspondence, complaints, court orders, settlements, and judgments.

3.1.13. Other Documents. All other data, correspondence, documents, agreements, waivers, notices, applications, and other records regarding the Property relating to transactions with taxing authorities, governmental agencies, utilities, vendors, tenants, neighbors, and others with whom Buyer may be dealing from and after the Closing Date.

3.1.14. Excluded Records. The Preliminary Documents shall not include any books, records, documents, or information on the corporate, financial, and accounting records of the operations of Seller as an entity (as opposed to records concerning the Property), regarding offers or inquiries made by third parties concerning the purchase of some or all of the Property or appraisals of the value of the Real Property that are attorney-client communications of Seller, that is Seller's attorney's work product, or that is not in the possession of Seller or persons under Seller's control.

3.2. Buyer's Approval of Preliminary Documents. Buyer's obligation to purchase the Property is expressly conditioned on its approval, in its sole discretion, of the matters disclosed in the Preliminary Documents. Buyer shall have the period from the Effective Date and until one hundred fifteen (115) days thereafter to review the Preliminary Documents and to decide whether to approve the matters disclosed in the Preliminary Documents. On or before the Contingency Date, Buyer shall deliver written notice to Seller either accepting the matters disclosed in the Preliminary Documents or terminating this Agreement. If Buyer fails to give such notice on or before the Contingency Date, Buyer shall be deemed to have elected to terminate this Agreement.

3.3. Approval of Title. Buyer's obligation to purchase the Property is expressly conditioned on Buyer's approval of the condition of title of the Property in accordance with the following procedure:

3.3.1. Title Objections. With respect to any Title Objection arising or resulting from any act or omission of Seller, Seller shall have seven (7) days after delivery of Buyer's Title Notice (or Buyer's deemed objection to all exceptions), to specify the manner in which it will remove or cure such Title Objection. With respect to any Title Objection that did not arise or result from any act or omission of Seller, Seller shall have ten (10) days after delivery of Buyer's Title Notice, to give notice to Buyer in writing (Seller's Title Notice), stating either (a) the manner in which Seller will remove or cure such Title Objection, or (b) that Seller shall not remove or cure such Title Objection. If Seller fails to deliver Seller's Title Notice within the time specified in this section 3.3, Seller shall be deemed to have elected not to cure such Title Objection. Despite the foregoing, Seller agrees to remove all liens securing the payment of money that encumber the Property.

3.3.2. Seller Elects Not to Cure. If Seller elects not to cure or remove a Title Objection (or is deemed to have so elected), then Buyer shall have ten (10) days after

delivery of the Seller's Title Notice to deliver a written notice to Seller (Buyer's Election Notice) of Buyer's election either to (a) proceed with the purchase of the Property, waive such Title Objection, and accept the exception shown in the Preliminary Report as a Permitted Exception, or (b) terminate this Agreement. If Buyer fails to deliver Buyer's Election Notice within the time specified in this section 3.3, Buyer shall be deemed to have elected to terminate this Agreement.

3.3.3. <u>Nonmonetary Cure.</u> If Seller is obligated or elects to cure or remove a Title Objection, but the method specified for removing or curing the Title Objection is other than the payment of a specific sum of money, then Buyer shall have ten (10) days after delivery of the Seller's Title Notice to deliver Buyer's Election Notice specifying whether it elects to (a) proceed with the purchase of the Property, subject to Seller's removal of the Title Objection, or (b) terminate this Agreement. If Buyer fails to deliver Buyer's Election Notice within the time specified in this section 3.3, Buyer shall be deemed to have elected to terminate this Agreement.

3.3.4. <u>Additional Encumbrances.</u> If any encumbrance or other exception to title arises or is discovered after the delivery of the Preliminary Report (Additional Encumbrance), the party discovering such Additional Encumbrance shall promptly give written notice to the other. No later than five (5) days after delivery of the notice of such Additional Encumbrance, Buyer shall deliver a new Buyer's Title Notice to Seller specifying whether the Additional Encumbrance is a Title Objection or a Permitted Exception. If Buyer objects to the Additional Encumbrance, the parties shall proceed in the same manner as set forth above for Title Objections arising from the Preliminary Report. If Buyer fails to deliver Buyer's Election Notice within the time specified in this section 3.3, Buyer shall be deemed to have elected to terminate this Agreement.

3.3.5. <u>Seller's Failure to Remove Title Objection.</u> If Seller is obligated or elects to cure or remove a Title Objection and fails to do so least five (5) days before the Closing Date, or fails to show that it will be able to do so on Closing, then Seller shall be in default under this Agreement, and Buyer shall have all its rights and remedies provided by this Agreement.

3.4. <u>Review of Preliminary Documents and Physical Condition.</u>

3.4.1. <u>Due Diligence.</u> Buyer's obligation to purchase the Property is expressly conditioned on its approval, in its sole discretion, of the condition of the Property and all other matters concerning the Property, including without limitation economic, financial, and accounting matters relating to or affecting the Property or its value, and the physical and environmental condition of the Property. Buyer shall have until the Contingency Date to conduct such investigations as Buyer may chose (Due Diligence) to determine, in its sole discretion, whether this contingency is met. On or before the Contingency Date, Buyer shall deliver written notice to Seller accepting the Property, or terminating

this Agreement. If Buyer fails to give such notice on or before the Contingency Date, Buyer shall be deemed to have elected to terminate this Agreement.

3.4.2. Access to Property. As part of its Due Diligence, Buyer may investigate economic, financial, and accounting matters relating to or affecting the Property or its value, and conduct inspections, tests, and studies with respect to the physical and environmental condition of the Property. Buyer and Buyer's consultants, agents, engineers, inspectors, contractors, and employees (Buyer's Representatives) shall be given reasonable access to the Property during regular business hours for the purpose of performing such Due Diligence. Buyer shall undertake the Due Diligence at its sole cost and expense, except as otherwise provided in this agreement. Buyer shall indemnify, defend with counsel reasonably acceptable to Seller, and hold Seller harmless from all claims (including claims of lien for work or labor performed or materials or supplies furnished), demands, liabilities, losses, damages, costs, fees, and expenses, including Seller's reasonable attorney fees, costs, and expenses, arising from the acts or activities of Buyer or Buyer's Representatives in, on, or about the Property during or arising in connection with Buyer's inspections of the Property.

3.4.3. Assumption of Risk. Subject to the other provisions of this Agreement, Buyer agrees, that by its acceptance or waiver of the contingency in this section 3.3, it assumes the risk that an adverse condition of the Property may not have been revealed by its own Due Diligence. On Buyer's acceptance or waiver of the contingency in this section 3.4, Seller shall have no obligation to repair, correct, or compensate Buyer for any condition of the Property, including defects in the improvements, noncompliance with applicable laws and regulations, including without limitation zoning laws, building codes, and the Americans with Disabilities Act, whether or not such condition of the Property would have been disclosed by Buyer's Due Diligence.

3.5. Termination for Failure of a Contingency. If this Agreement is terminated or deemed to be terminated for failure of a contingency set forth in this Article 3, then immediately on written notice from Buyer, Escrow Holder must refund the Deposit without offset for any charges or claims. Any cancellation fee or other costs of the Escrow Holder or the Title Company resulting from this termination for failure of a contingency, shall be borne equally by Seller and Buyer, and each party shall pay its own expenses.

## ARTICLE 4

### SELLER'S PRECLOSING COVENANTS

4.1. No Amendment or Agreements. On or after the Effective Date, Seller shall not (a) amend or waive any right under any Preliminary Document or (b) enter into any lease or other agreement of any type affecting the Property that would survive the Closing Date, without Buyer's prior written consent.

4.2. Insurance. Through the Closing Date, Seller must maintain or cause to be maintained in full force and effect comprehensive general liability casualty and other insurance on the Property in an amount equal to the full replacement cost of the Improvements.

4.3. Maintenance and Operation. Seller, at its sole cost and expense, must operate the Property in substantially the same manner as it has operated the Property before the Effective Date and must maintain and keep the Property such that on the Closing Date the Property is in at least as good condition and repair as on the Effective Date, reasonable wear and tear excepted. Seller may not make any material alterations to the Property without Buyer's prior written consent.

4.4. Mechanics' Liens. Except for materials, supplies, or work provided or ordered for the Property at the request of or for the account of Buyer, on or before the Closing, Seller must (a) pay for all materials, supplies, and work provided or ordered for the Property for which a labor, materialman's, or mechanics' lien may be claimed under applicable law and (b) if required by the Title Company, provide the Title Company with such indemnifications or security as it may require to insure title to the Property at the Closing without exception for any unrecorded labor, materialman's, or mechanics' claim of lien.

4.5. No Marketing. Seller agrees not to market, show, or list the Property to any other prospective buyer during the term of this Agreement.

4.6. Existing Financing. Seller shall not permit any default, or any event that could give rise to a default with lapse of time or notice, to occur under any existing loan secured by the Property or other financing encumbering the Property.

4.7. Licenses and Permits. Seller shall use due diligence and its best efforts to keep in full force and effect, and shall renew, when necessary, all licenses and permits for the Property.

4.8. Access to Property. Buyer and Buyer's representatives, agents, and designees shall have the right at all reasonable times until Closing to enter the Property as provided in section 3.4.

4.9. Notification. Seller shall promptly notify Buyer of any material change in any condition with respect to the Property or of any material event or circumstance that makes any representation or warranty of Seller under this Agreement untrue or misleading.

## ARTICLE 5

## REPRESENTATIONS AND WARRANTIES

5.1 Seller's Representations and Warranties. Despite anything to the contrary in this Agreement, Seller warrants and represents as of the Effective Date that:

5.1.1. Organization; Authority. This Agreement and the performance of Seller's obligations under it and all documents executed by Seller that are to be delivered to Buyer at the Closing are, or on the Closing Date shall be, duly authorized, executed, and delivered by Seller and are, or at the Closing Date shall be, legal, valid, and binding obligations of Seller, and do not, and on the Closing Date shall not, violate any provision of any agreement or judicial order to which Seller is a party or to which Seller or the Property is subject. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, government agency, or other party is required for Seller to enter into or to perform Seller's obligations under this Agreement, except as has already been obtained.

5.1.2. No Violation of Law. To Seller's knowledge, Seller has received no written notice of any currently outstanding violations of any federal, state, county, or municipal law, ordinance, order, regulation, or requirement affecting the Property.

5.1.3. Litigation. To Seller's knowledge, Seller has not received any written notice of any existing or threatened litigation or arbitration involving the Property.

5.1.4. Preliminary Documents. To Seller's knowledge, the Preliminary Documents constitute all books, records, documents, agreements, contracts, reports, and other materials related to the Property that are in Seller's possession or control. To Seller's knowledge, the Preliminary Documents are true, correct, and complete copies of what they purport to be.

5.1.5. No Condemnation. To Seller's knowledge, Seller has received no written notice of any presently pending or contemplated special assessments or proceedings to condemn or demolish the Property or any part of it, or any proceedings to declare the Property or any part of it a nuisance.

5.1.6. Hazardous Wastes. To Seller's knowledge, Seller has received no written notice of any Hazardous Materials located on, under, or about the Property, except as disclosed in the Preliminary Documents.

5.1.7. Foreign Person. Seller is not a foreign person and is a "United States Person" as that term is defined in §7701(a)(30) of the Internal Revenue Code of 1986, as amended.

5.1.6. Seller's Knowledge. As used in this Agreement, the phrase "Seller's knowledge" shall be limited to the actual knowledge of DAVID E. SHIPNUCK and LESLIE K. SHIPNUCK, without duty of inquiry or investigation into the matter so qualified. "Seller's knowledge" shall not be construed to refer to the knowledge of any other agent or employee or principal of Seller.

5.2. Buyer's Representations and Warranties. Despite anything to the contrary in this Agreement, Buyer hereby warrants and represents that, as of the Effective Date, this Agreement and the performance of Buyer's obligations under it and all the documents executed by Buyer that are to be delivered to Seller at the Closing are, or on the Closing Date shall be, duly authorized, executed, and delivered by Buyer and are, or at the Closing Date shall be, legal, valid, and binding obligations of Buyer, and do not, and on the Closing Date shall not, violate any provisions of any agreement or judicial order to which Buyer is a party or to which Buyer or the Property is subject. No consent of any partner, shareholder, creditor, investor, judicial or administrative body, government agency, or other party is required for Buyer to enter into or to perform Buyer's obligations under this Agreement, except as has already been obtained.

5.3. Effect of Representations and Warranties. Each representation and warranty in this Article 5 (a) is material and being relied on by the party to which the representation and warranty is made; (b) is true in all respects as of the Effective Date; (c) shall be true in all respects on the Closing Date; and (d) shall survive the Closing, except as otherwise provided in this Agreement.

5.4. Survival of Seller's Representations and Warranties and Limitation on Liability. The parties agree that (a) Seller's warranties and representations in this Agreement and in any document (including any estoppel or other certificate) executed by Seller under this Agreement with respect to the Property shall survive for six (6) months after the Closing Date, and (b) if Buyer fails to provide written notice to Seller of any breach of such warranties or representations within six (6) months after the Closing Date, Buyer shall be deemed to have waived all claims for breach of any representations and warranties with respect to the Property. Buyer's sole remedies shall be an action at law for damages as a consequence of such breach or termination of this Agreement and waiver of any further claims against Seller.

5.5. "As Is" Purchase. Subject to the approval or waiver of the Contingencies in Article 3, Seller's preclosing obligations under Article 4, the closing conditions in Article 6, and as a material inducement to Seller's execution and delivery of this Agreement and performance of its duties under this Agreement: EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, BUYER HAS AGREED TO ACCEPT POSSESSION OF THE PROPERTY ON THE CLOSING DATE ON AN "AS IS" BASIS. SELLER AND BUYER AGREE THAT THE PROPERTY SHALL BE SOLD "AS IS, WHERE IS, WITH ALL FAULTS" WITH NO RIGHT OF SET-OFF OR REDUCTION IN THE PURCHASE PRICE, AND, EXCEPT AS SET FORTH IN SECTION 5.2 OF THIS AGREEMENT, SUCH SALE SHALL BE WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, WARRANTY OF INCOME POTENTIAL, OPERATING EXPENSES, USES, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND SELLER DISCLAIMS AND RENOUNCES ANY SUCH REPRESENTATION OR WARRANTY.

## ARTICLE 6

## CLOSING CONDITIONS

6.1. Buyer's Closing Conditions. All obligations of Buyer under this Agreement are subject to the fulfillment, before or at the Closing, of each of the following conditions (Buyer's Closing Conditions). Buyer's Closing Conditions are solely for Buyer's benefit and any or all of the Buyer's Closing Conditions may be waived in writing by Buyer in whole or in part without prior notice.

6.1.1. Title. It is a Buyer's Closing Condition that, on the Closing Date, Seller convey to Buyer marketable fee simple title to the Real Property by execution and delivery of a grant deed, and cause to be delivered to Buyer from the Title Company an ALTA Owner's Extended Coverage Policy of Title Insurance with liability in the full amount of the Purchase Price, insuring title to the Real Property in Buyer, subject only to the Permitted Exceptions, together with such endorsements described below or as may be reasonably requested by Buyer (Title Policy). The Title Policy must also include such endorsements or guaranties as Buyer may request. Seller must deliver to the Title Company such instruments, documents, releases, and agreements and must perform such other acts as Title Company may reasonably require in order to issue the Title Policy. Indemnification of the Title Company to induce it to insure any otherwise unpermitted exception to title shall not be allowed except with Buyer's prior written consent after full disclosure to Buyer of the nature and substance of such exception and indemnity, which consent shall not be unreasonably withheld by Buyer for exceptions not material to marketable title to the Real Property.

6.1.2. Liens. Buyer must have received a certified report, with copies of all documents, satisfactory to Buyer and Buyer's counsel, from the Title Company or a

reputable lien search company indicating that there are no personal property liens of record on file with the Secretary of State of California.

6.1.3. Seller's Representations, Warranties, and Covenants. The representations and warranties of Seller in this Agreement must be true in all material respects on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of the Closing Date. Seller must have performed and complied with all covenants, agreements, and conditions required by this Agreement to be performed or complied with by it before or on the Closing Date. Buyer must have been furnished with a certificate of Seller dated as of the Closing Date, certifying to the fulfillment of the foregoing conditions. Such certificate shall have the effect of a representation and warranty of Seller made on and as of the Closing Date.

6.1.4. Closing Documents. Seller must have delivered to Escrow the documents and funds it is required to deliver through Escrow at Closing.

6.1.5. Physical Condition. The physical condition of the Property must be substantially the same on the Closing Date as on the Effective Date, reasonable wear and tear excepted.

6.1.6. Adverse Actions. There shall exist no actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization, or other proceedings, pending or threatened, against Seller or regarding the Property that would materially and adversely affect the Seller's ability to perform its obligations under this Agreement or Buyer's title to the Property and there shall exist no pending or threatened action, suit, or proceeding regarding the Seller before or by any court or administrative agency that seeks to restrain or prohibit, or to obtain damages or a discovery order with respect to, this Agreement or the consummation of the transactions contemplated by this Agreement.

6.1.7. Hazardous Material. No Hazardous Materials shall have been discovered on the Property after the Contingency Date that were not previously disclosed to Buyer or discovered by Buyer before the Contingency Date.

6.1.8 No Material Changes. No event shall have occurred nor shall any condition have arisen after the Contingency Date that as of the Closing Date materially and adversely affects all or any part of the Property or its current or prospective operation, use, value, income, expenses, or occupancy.

6.1.9. Consents. All necessary agreements and consents of all parties to consummate the transaction contemplated by this Agreement shall have been obtained and furnished by Seller to Buyer.

6.2. Seller's Closing Conditions. Seller's obligation to sell the Property is expressly conditioned on the fulfillment of each condition precedent at or before the Closing (Seller's Closing Conditions). Seller's Closing Conditions are solely for Seller's benefit and any of Seller's Closing Conditions may be waived in writing by Seller in whole or in part without prior notice.

6.2.1. Approval of Contingencies. It is a Seller's Closing Condition that Buyer must have acknowledged its approval or waiver of all contingencies as required under Article 3.

6.2.2. Purchase Price. Buyer must have delivered the Purchase Price to Escrow.

6.2.3. Delivery of Closing Documents and Funds. Buyer must have delivered to Escrow the documents and funds specified in section 7.4.2.

6.2.4. Buyer's Representations, Warranties, and Covenants. The representations and warranties of Buyer in this Agreement must be true in all material respects on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of the Closing Date. Buyer must have performed and complied with all covenants, agreements, and conditions required by this Agreement to be performed or complied with by it before or on the Closing Date. Seller must have been furnished with a certificate of Buyer dated as of the Closing Date, certifying to the fulfillment of the foregoing conditions such certificate shall have the effect of a representation and warranty of Buyer made on and as of the Closing Date.

6.3. Termination for Failure of a Condition. If Buyer's Closing Conditions or Seller's Closing Conditions, as the case may be, have not been previously approved or waived, this Agreement may be terminated by the party in whose favor the Closing Condition runs by written notice to the other. If this Agreement is so terminated, the parties shall have no further obligation or liability under this Agreement, except as provided in Article 9 and this section 6.3. Subject to Buyer's obligations and covenants under section 6.2 and subject to Article 9, on such termination, Escrow Holder must return the Deposit to Buyer. Any cancellation fee or other costs of the Escrow Holder and Title Company shall be borne equally by Seller and Buyer and each party shall pay its own expenses.

## ARTICLE 7

## CLOSING

7.1. Escrow. The Escrow shall be opened with the Escrow Holder on the execution of this Agreement. Buyer and Seller shall promptly on the Escrow Holder's request execute such additional escrow instructions as are reasonably required to consummate the transaction contemplated by this Agreement and are not inconsistent with this Agreement.

7.2. Closing Definitions.

7.2.1. Definition. The "Closing" means the exchange of money and documents as described in this Article 7, and shall be deemed to have occurred when Seller's Deed to Buyer has been recorded, the Escrow Holder holds and can record and deliver the remaining documents described in this Article 7, the Title Company is irrevocably and unconditionally committed to issue the Title Policy, and Buyer has delivered the Purchase Price in immediately available funds to Escrow Holder.

7.2.2. Closing Date. Seller and Buyer agree that the Closing shall occur on the "Closing Date." The Closing Date shall be a date mutually agreeable to Buyer and Seller that is no later than five (5) days after the Contingency Date. If the Closing has not occurred within five (5) days after the Contingency Date, then subject to section 6.3 either party may elect to terminate this Agreement, the Deposit shall be returned to Buyer, and neither party shall have any obligations to the other except on account of any breach of this Agreement. The Closing shall be at the offices of Escrow Holder or such other place as the parties may agree.

7.3. Seller's Deposit of Documents and Funds. Seller must deposit into Escrow the following documents duly executed by Seller in form and substance reasonably satisfactory to Buyer:
7.3.1. Deed. The duly executed and acknowledged Deed conveying the Property to Buyer subject only to the Permitted Exceptions;

7.3.2. Lease Assignment. A duly executed assignment of Leases,  assigning to Buyer Seller's interest as lessor in all the Leases (Lease Assignment);

7.3.3. Nonforeign Certification. Certificates required by §1445 of the Internal Revenue Code of 1986, and the California Revenue and Taxation Code §18815, executed by Seller and in a form satisfactory to Buyer (Nonforeign Certification), to relieve Buyer of any potential transferee's withholding liability under such statutes;
7.3.4. Seller's Proof of Power and Authority. Such proof of Seller's authority and authorization to enter into and perform under this Agreement, and such proof of power and authority of the individuals executing or delivering any instruments, documents, or certificates on behalf of Seller to act for and bind Seller as may reasonably be required by Buyer or the Escrow Holder; and

7.3.5. Additional Documents. Such additional documents, including written Escrow instructions consistent with this Agreement, as may be necessary or desirable to convey the Property in accordance with this Agreement.

7.4. Buyer's Deposit of Documents and Funds. Buyer must deposit into Escrow the following funds and documents duly executed by Buyer in form and substance reasonably satisfactory to Seller:

7.4.1. Purchase Price. The Purchase Price in accordance with Article 2, plus or minus prorations as provided in section 7.7.

7.4.2. Lease Assignment. A duly executed assignment of Leases, by which Buyer assumes Seller's interest as lessor in all the Leases (Lease Assignment);

7.4.3. Buyer's Proof of Power and Authority. Such proof of Buyer's authority and authorization to enter into and perform under this Agreement, and such proof of power and authority of the individuals executing or delivering any instruments, documents, or certificates on behalf of Buyer to act for and bind Buyer as may reasonably be required by Seller and the Escrow Holder; and

7.4.4. Conveyance Documents. Such documents, including written Escrow instructions consistent with this Agreement, as may be necessary or desirable for conveyance of the Property in accordance with this Agreement.

7.5. Closing. When the Escrow Holder receives all documents and funds identified in sections 7.3 and 7.4, and the Title Company is ready, willing, and able to issue the Title Policy, then, and only then, the Escrow Holder shall close Escrow by:

7.5.1. Recording the Deed;

7.5.2. Recording the Lease Assignment;

7.5.3. Issuing the Title Policy to Buyer;

7.5.4. Delivering to Buyer the Assignment, the Updated Rent Roll, the original Leases, the Nonforeign Certification, and copies of all recorded documents.

7.5.5. Paying the Purchase Price to Seller, plus or minus prorations under section 7.7.

7.5.6. Thereafter, Escrow Holder shall deliver signed closing statements showing all receipts and disbursements to Buyer and Seller.

7.6. Deliveries Outside Escrow. Seller agrees to deliver the following to Buyer outside Escrow within three (3) business days after Closing:

7.6.1. Letters in form and substance satisfactory to Buyer, signed, and stamped by Seller and addressed to each tenant at the Property, stating that the Property has been sold to Buyer and that all rents should be paid to Buyer after the Closing Date (Tenant Notices);

7.6.2. The Updated Rent Roll current through the day before the Closing Date;

7.7. Prorations. All receipts and disbursements of the Property shall be prorated as of 11:59 p.m. on the day immediately preceding the Closing Date and the Purchase Price shall be adjusted on the following basis:

7.7.1. Property Rents.

(a) Collected Rents. All rents collected by Seller under the Leases in effect on the Closing Date, including rents on account of operating cost pass-throughs, percentage rents, and other charges paid by tenants (Collected Rents) shall be prorated as of the Closing by charging Seller and crediting Buyer for any Collected Rents applicable to periods after the Closing.

(b) Delinquent Rents. All unpaid rents that are due and owed to Seller under the Leases in effect on the Closing Date, including rents on account of operating cost pass-throughs, percentage rents, and other charges paid by tenants (Delinquent Rents) shall not be prorated and shall remain the property of Seller. Buyer shall deliver any Delinquent Rents received by Buyer to Seller, less the actual costs of collection, on the condition that Buyer shall apply all rent received from tenants under the Leases first to any obligations arising under the Leases after the Closing and Buyer shall then apply the balance, if any, to the Delinquent Rents. Seller shall have the right to collect Delinquent Rents, at Seller's sole cost and expense, on the condition that Seller shall have no right to cause the eviction of, and Buyer shall have no obligation to evict, any tenants owing Delinquent Rents.

7.7.2. Security Deposits. At Closing, Buyer shall be credited and Seller shall be charged with the amount of all security deposits received under the Leases in effect as of the Closing.

7.7.3. Capital Expenditures and Accounts Payable. All capital and other improvements (including labor and material) that are performed or contracted for, by or on behalf of Seller before the Closing Date, and all sums due for accounts payable that were owed or incurred by the Property before the Closing Date, must be paid by Seller.

7.7.4. _Leasing Commissions._ Seller shall pay when due, whether before or after Closing, all leasing commissions payable with respect to Leases and extensions, renewal, and expansions of the Leases that were fully executed before the Contingency Date. Seller shall be credited and Buyer shall be charged the amount of leasing commissions paid by Seller on account of Leases and extensions, renewals, and expansions of the Leases that were fully executed after the Contingency Date.

7.7.5. _Property Taxes._ All real and personal property ad valorem taxes and special assessments, if any, whether payable in installments or not, including without limitation all supplemental taxes attributable to the period before the Closing Date for the calendar year in which the Closing occurs shall be prorated to the Closing Date, based on the latest available tax rate and assessed valuation.

7.7.6. _Utility Charges._ Charges for utilities, including water, sewer, electric, and gas, shall be prorated within thirty (30) days after the Closing Date based on the then most recent bills for such services. Seller shall pay for all utility services to the Property for all periods before the Closing and Buyer shall pay for all utility services to the Property for the Closing Date and all periods thereafter.

7.8. _Closing Costs._ Closing costs shall be allocated as follows:

7.8.1. Seller shall pay all costs associated with removing any debt encumbering the Property;

7.8.2. Escrow costs shall be shared equally by Seller and Buyer;

7.8.3. Seller shall pay the cost of the Title Policy;
7.8.4. Buyer shall pay the cost of recording the Deed;

7.8.5. Buyer shall pay any sales tax; and

7.8.6. The documentary transfer tax and any municipal transfer tax shall be paid by Seller.

7.9. Broker's Commission; Indemnity. Seller shall pay ORION PARTNERS LIMITED (Broker) for its services as broker in this transaction. Neither party has had any contact or dealings regarding the Property, or any communication in connection with the subject matter of this transaction, through any licensed real estate broker or person, other than the Broker, who can claim a commission or finder's fee as a procuring cause of the sale contemplated in this Agreement. If any other broker or finder perfects a claim for a commission or finder's fee based on any contract, dealings, or communication with a party (Indemnifying Party), then the Indemnifying Party shall indemnify, defend, and hold the other party (Nonindemnifying Party) harmless from all costs and expenses (including reasonable attorney fees and costs of defense) incurred by the Nonindemnifying Party in connection with such claim.  Broker's commission shall be an amount equal to five percent (5%) of the  sale price.

7.10. Possession. Seller shall deliver exclusive right of possession of the Property to Buyer on the Closing Date, subject only to the interest of tenants under the Leases.

## ARTICLE 8

## RISK OF LOSS

8.1. Condemnation. If before the Closing Date any action or proceeding is commenced for the condemnation or exercise of the rights of eminent domain of the Property or any portion of it, or if Seller is notified by the duly authorized officer of a duly empowered condemning authority of the intent to commence such action or proceeding (Condemnation) and if such Condemnation would materially and adversely affect the use or operation of the Property, have the effect of decreasing the square footage of the Improvements, or reduce or eliminate access to the Property, then Buyer may either (a) terminate this Agreement or (b) proceed with the Closing without modifying the terms of this Agreement and without reducing the Purchase Price, on the condition that Seller must assign and turn over, and Buyer shall be entitled to keep, all awards for the Condemnation that accrue to Seller. Seller may not negotiate, resist, or stipulate to any Condemnation without Buyer's written consent. Seller must notify Buyer of any notice of Condemnation of all or any portion of the Property within five (5) days after the receipt of this notice, and Buyer must exercise its option(s) as provided in this section 8.1 within ten (10) days after receipt of such notice. If necessary, the Closing Date shall be extended to give Buyer the full 10-day period to make such election.

8.2. Damage and Destruction. If before the Closing Date any damage or destruction of the Property, or any portion of it shall have occurred that results in an Uninsured Loss of Twenty-Five Thousand Dollars ($25,000.00) or less, then at the Closing Seller must assign to Buyer the right to collect any Insurance Proceeds with respect to such loss and give Buyer a credit against the Purchase Price in the amount of such Uninsured Loss. If such damage or destruction results in an Uninsured Loss of more than Twenty-Five Thousand Dollars ($25,000.00), then within five (5) days after determination of the amount of the Insurance Proceeds Seller shall elect either (a) to give Buyer a credit for the entire amount of such Uninsured Loss and assign to Buyer the right to collect any Insurance Proceeds with respect to such loss or (b) to terminate this Agreement. Despite any such damage or destruction, the Purchase Price for the Property shall not be reduced except by the credits referred to above. For purposes of this section 8.2, Uninsured Loss shall mean the difference between (i) the sum of the actual cost necessary for the Seller to fully repair such damage and destruction, as determined by a qualified insurance adjuster selected by the insurance carrier providing insurance for the Property, and (ii) the total amount of Insurance Proceeds, which shall mean the proceeds from any and all insurance with respect to the Property and/or to such loss, including without limitation fire and casualty and liability insurance. Uninsured Losses may arise because of self-insurance, deductible amounts under policies, proceeds of policies insufficient to cover the loss, risks not insured for, or otherwise. If any damage to or destruction of the Property occurs, the Closing Date shall be extended until the amount of the Insurance Proceeds is determined and Seller has made any election permitted under this section 8.2.

## ARTICLE 9

## REMEDIES FOR DEFAULT

9.1. Buyer's Default. Buyer shall be deemed to be in default under this Agreement if Buyer fails, for any reason other than Seller's default under this Agreement or the failure of a condition precedent to Buyer's obligation to perform under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty (made by Buyer) by reason of Buyer's actual fraud or intentional misrepresentation; provided, however, that no such default shall be deemed to have occurred unless and until Seller has given Buyer written notice of this Agreement, describing the nature of the default, and Buyer has failed to cure such default within five (5) days after the receipt of such notice (but in any event before the Closing Date, unless such default occurs after Closing).

9.2. REMEDIES FOR BUYER'S DEFAULT. IF THE CLOSING FAILS TO OCCUR BECAUSE OF BUYER'S DEFAULT UNDER THE TERMS OF THIS AGREEMENT, BUYER SHALL BE RESPONSIBLE FOR ALL CANCELLATION CHARGES REQUIRED

TO BE PAID TO ESCROW HOLDER AND ANY ESCROW CHARGES. IN ADDITION, THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES SHALL TERMINATE AND THE DEPOSITS SHALL BE IMMEDIATELY DELIVERED BY ESCROW HOLDER TO SELLER ON SELLER'S REQUEST. THE DEPOSITS SHALL BE DEEMED LIQUIDATED DAMAGES FOR BUYER'S NONPERFORMANCE AS SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST BUYER (INCLUDING, WITHOUT LIMITATION, SELLER'S RIGHTS TO SEEK SPECIFIC PERFORMANCE OF THIS AGREEMENT AND TO RECEIVE DAMAGES) FOR BUYER'S FAILURE TO PURCHASE THE PROPERTY, WHICH SUMS SHALL BE PRESUMED TO BE A REASONABLE ESTIMATE OF THE AMOUNT OF ACTUAL DAMAGES SUSTAINED BY SELLER BECAUSE OF BUYER'S BREACH OF ITS OBLIGATION TO PURCHASE THE PROPERTY. FROM THE NATURE OF THIS TRANSACTION, IT IS IMPRACTICABLE AND EXTREMELY DIFFICULT TO FIX THE ACTUAL DAMAGES THAT SELLER WOULD SUSTAIN IF BUYER BREACHES SUCH OBLIGATION. THE IMPRACTICABILITY AND DIFFICULTY OF FIXING ACTUAL DAMAGES IS CAUSED BY, WITHOUT LIMITATION, THE FACT THAT THE PROPERTY IS UNIQUE. GIVEN THE FOREGOING FACTS, AMONG OTHERS, BUYER AND SELLER AGREE THAT LIQUIDATED DAMAGES ARE PARTICULARLY APPROPRIATE FOR THIS TRANSACTION AND AGREE THAT SAID LIQUIDATED DAMAGES SHALL BE PAID IN THE EVENT OF BUYER'S BREACH OF ITS OBLIGATION TO PURCHASE THE PROPERTY, DESPITE ANY WORDS OR CHARACTERIZATIONS PREVIOUSLY USED OR CONTAINED IN THIS AGREEMENT IMPLYING ANY CONTRARY INTENT. THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE §3275 OR §3369 BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER UNDER CALIFORNIA CIVIL CODE §§1671, 1676, AND 1677. NOTHING IN THIS AGREEMENT SHALL, HOWEVER, BE DEEMED TO LIMIT BUYER'S LIABILITY TO SELLER FOR DAMAGES OR INJUNCTIVE RELIEF FOR BREACH OF BUYER'S INDEMNITY OBLIGATIONS UNDER SECTION 3.4.2, OR FOR ATTORNEY FEES AND COSTS AS PROVIDED IN SECTION 10.10.

WE ACKNOWLEDGE THIS LIQUIDATED DAMAGES PROVISION:

SELLER'S INITIALS: _____       _____

BUYER'S INITIALS:

9.3. Seller's Default. Seller shall be deemed to be in default under this Agreement if Seller fails, for any reason other than Buyer's default under this Agreement or the failure of a condition precedent to Seller's obligation to perform under this Agreement, to meet, comply with, or perform any covenant, agreement, or obligation required on its part within the time limits and in the manner required in this Agreement, or a material breach shall have occurred of any representation or warranty (made by Seller) because of Seller's actual fraud or intentional misrepresentation; provided, however, that no such default shall be deemed to have occurred unless and until Buyer has given Seller written notice of the default, describing its nature, and Seller has failed to cure such default within five (5) days after receipt of such notice (but in any event before the Closing Date, unless such default occurs after Closing).

9.4. Remedies for Seller's Default. If Seller defaults in its obligations under this Agreement to sell the Property to Buyer on the Closing Date through no fault of Buyer, then Buyer at its option may have the right to specific performance of this Agreement or the right to recover the Deposit and all of its general and specific damages. If, after the Closing Date, Buyer determines that Seller has breached any representation or warranty set forth in Article 5, then Buyer shall have the right to bring an action for general and specific damages to Buyer. If this Agreement is terminated before the Closing Date for Seller's default, then, in addition to any remedy Buyer has under this Agreement, Seller shall reimburse Buyer for the costs incurred by Seller in conducting its Due Diligence.

9.5. Resolution of Disputes. Controversies or claims between Seller and Buyer that arise from (a) this Agreement (including any modifications to this agreement), (b) any document, agreement, or procedure related to or delivered in connection with this Agreement or the Property, (c) any violation of this Agreement, or (d) any claims for damages resulting from any business conducted between Seller and Buyer, including claims for injury to persons, property, or business interests (torts) (collectively Arbitrable Disputes) shall be resolved under this section 9.5, which shall survive termination of this Agreement. Wherever this Agreement refers to arbitration as the means of resolving disputes between the parties, the parties agree to follow the procedure described immediately below before commencing arbitration procedures. The filing of a judicial action during the term of this Agreement to enforce the other party's performance under this Agreement, e.g., for an order of attachment, injunction, or other remedy, shall not constitute a waiver to the filing party's right or breach of the filing party's obligation to arbitrate; provided, however, that in no circumstances following the termination of this Agreement shall Buyer be entitled to record a notice of pending action (lis pendens) or take other action or seek other remedies that would have the effect of clouding Seller's title or restricting Seller's ability to convey or encumber the Property, free of any claim by Buyer to the Property.

9.5.1. Arbitration of Disputes.

(a) <u>General.</u> Any controversies or claims between Seller and Buyer that arise from Arbitrable Disputes shall be settled by arbitration in the City of San Francisco, California, in accordance with the Commercial Arbitration Rules (Rules of the American Arbitration Association (AAA)) if not inconsistent with other provisions of this Agreement, and judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties submit to the jurisdiction of the Superior Court of the State of California, County of Sonoma, for purposes of confirming in any such award and entering judgment. The parties further agree that, despite anything to the contrary that may now or hereafter be contained in the Rules of the AAA, this section 9.5.1 shall control.

(b) <u>Appointment.</u> Within ten (10) days after receipt of a notice of arbitration (Demand) from the other party, each party shall appoint one person to hear and decide the dispute. The two persons so chosen shall, within  ten (10) days after their appointment, appoint a third impartial arbitrator (who shall be an attorney at law licensed to practice in California), and the final majority decision of the three arbitrators shall be final and conclusive on the parties to this Agreement. Each appointment of an arbitrator shall be deemed complete on delivery by the appointing party of written notice of appointment of that arbitrator to the Regional Office of the AAA. If either Seller or Buyer fails to designate its arbitrator within the specified period after receipt of the Demand, then the arbitrator designated by the other party shall sit as the sole arbitrator and shall be deemed to be the single, mutually approved arbitrator to resolve the Arbitrable Dispute. If the party-appointed arbitrators are unable to appoint an impartial arbitrator, the impartial arbitrator shall be appointed under the Rules of the AAA. If the parties cannot agree on a rate of compensation for the arbitrators, they shall be compensated for their services at a rate to be determined by the AAA.

(c) <u>Costs.</u> Except as provided in this section 9.5.1, each party shall bear its own costs and expenses of arbitration, including, but not limited to, filing fees, attorney fees, the fees of the arbitrator appointed by the party, and costs of transcripts, and each party agrees to pay half of the compensation to be paid to the neutral arbitrator in the arbitration. The arbitrators shall not have the power or competence to allocate between the parties in their award any costs, expenses, fees, or share of arbitrators' compensation.

(d) <u>Written Opinion.</u> The arbitrators shall, on the request of either Seller or Buyer, issue a written opinion of their findings of fact and conclusions of law. On receipt by the requesting party of this written opinion, the party shall have the right to file with the arbitrators a motion to reconsider, and the arbitrators shall then reconsider the issues raised by this motion and either confirm or change their majority decision, which shall then be final and conclusive on the parties.

(e) <u>Applicability of Code of Civil Procedure.</u> It is specifically contemplated and agreed by the parties that California Code of Civil Procedure §1283.05, as it may be

amended from time to time, shall be incorporated into, made a part of, and made applicable to the arbitration agreement in this section 9.5.1.

(f) Power of Arbitrators. The arbitrators shall have the authority to issue any judgment or order, including punitive damages and equitable relief; provided, however, that the arbitrators' power to provide equitable relief or specific performance shall be limited to disputes in connection with the administration of this agreement and shall not preclude or restrict implementation of the termination provisions of this Agreement

(g) Statute of Limitations. For purposes of the statute of limitations, the filing of an arbitration under this section 9.5.1 is the equivalent of the filing of a lawsuit, and any claim or controversy that may be arbitrated under this section 9.5 is subject to any applicable statute of limitations. The arbitrators shall have the authority to decide whether any such claim or controversy is barred by the statute of limitations, and, if so, to dismiss the arbitration on that basis.

(h) Disagreement on Arbitrability. If the parties disagree on whether a dispute is an Arbitrable Dispute, the issue of arbitrability shall be resolved by litigation unless both parties in their sole discretion agree to make the issue of arbitrability an issue to be decided by the arbitrators under this section 9.5.1.

9.5.2. Statutory Notice. NOTICE: BY INITIALING IN THE SPACE BELOW, YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW, YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

THE UNDERSIGNED HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

Seller's Initials: _____    _____

Buyer's Initials: _____

**ARTICLE 10**

## GENERAL

10.1. Notices. Any notices relating to this Agreement shall be given in writing and shall be deemed sufficiently given and served for all purposes when delivered personally, by generally recognized overnight courier service, by facsimile (provided that sender retains a printed confirmation of delivery to the facsimile number provided below), or three (3) days after deposit in the United States mail certified or registered, return receipt requested, with postage prepaid, addressed as follows:

*TRUSTEE OF THE HORTON —*

SELLER:   DAVID E. SHIPNUCK *SHIPNICK LIVING*  LESLIE K. SHIPNUCK
              82 Melway Circle *TRIST, UAD 07/18/*  2071 Emerson Street
              Monterey, CA 93940 *2000, SPH*       Berkeley, CA 94703
              831-649-5160                              415-297-1631

          with a courtesy copy to:   KENNETH S. McTAGGART, ESQ.
                                           P.O. Box 1268
                                           Sonoma, CA 95476

BUYER:   THE GREENWOOD REVOCABLE TRUST
              17564 Seventh Street East
              Sonoma, CA 95476
              707-938-8730

          with a courtesy copy to:   ISAAC RABOY
                                           ORION PARTNERS LTD.
                                           470 First Street East
                                           Sonoma, CA 95476

Either party may change its address by written notice to the other given in the manner set forth above.

10.2. Entire Agreement. This Agreement and all exhibits addenda, schedules, agreements referred to in this Agreement constitute the complete, exclusive and final statement of the terms of the agreement with respect to the sole property between buyer and seller and may not be contradicted by evidence of any prior or contemporaneous agreement. This Agreement specifically supersedes any prior written or oral agreements between the parties. The language in all parts of this Agreement shall be construed as a whole in accordance with its fair meaning and without regard to California Civil Code §1654 or similar statutes. Neither party has been induced to enter into this Agreement by, and neither party is relying on, any representation or warranty outside those expressly set forth in this Agreement.

10.3. <u>Amendments and Waivers.</u> No addition to or modification of this Agreement shall be effective unless it is made in writing and signed by the party against whom the addition or modification is sought to be enforced. The party benefited by any condition or obligation may waive the same, but such waiver shall not be enforceable by another party unless it is made in writing and signed by the waiving party.

10.4. <u>Invalidity of Provision.</u> If any provision of this Agreement as applied to either party or to any circumstance is adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, this fact shall in no way affect (to the maximum extent permissible by law) any other provision of this Agreement, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Agreement as a whole.

10.5. <u>No Merger.</u> This Agreement, each provision of it, and all warranties and representations in this Agreement shall survive the Closing and shall not merge in any instrument conveying title to Buyer. All representations, warranties, agreements, and obligations of the parties shall, despite any investigation made by any party to this Agreement, survive Closing, and the same shall inure to the benefit of and be binding on the parties' respective successors and assigns.

10.6. <u>References.</u> Unless otherwise indicated, (a) all article and section references are to the articles and sections of this Agreement, and (b) except where otherwise stated, all references to days are to calendar days. Whenever under the terms of this Agreement the time for performance of a covenant or condition falls on a Saturday, Sunday, or California state holiday, such time for performance shall be extended to the next business day. "Business Days" means days other than Saturday, Sunday, and California State holidays. The headings used in this Agreement are provided for convenience only and this Agreement shall be interpreted without reference to any headings. The date of this Agreement is for reference purposes only and is not necessarily the date on which it was entered into.

10.7. <u>Governing Law.</u> This Agreement shall be governed by the laws of the State of California applicable to contracts made by residents of the State of California and to be performed in California.

10.8. <u>Confidentiality and Publicity.</u> Before the Closing, the parties shall at all times keep this transaction and any documents received from each other confidential, except to the extent necessary to (a) comply with applicable law and regulations or (b) carry out the obligations set forth in this Agreement. Any such disclosure to third parties shall indicate that the information is confidential and should be so treated by the third party. Before the Closing, no press release or other public disclosure may be made by either party or any of its agents concerning this transaction without the other party's prior written consent.

10.9. Time. Time is of the essence in the performance of the parties' respective obligations under this Agreement.

10.10. Attorney Fees. In the event of any action or proceeding to enforce a term or condition of this Agreement, any alleged disputes, breaches, defaults, or misrepresentations in connection with any provision of this Agreement or any action or proceeding in any way arising from this Agreement, including any interpleader of the Deposit by the Escrow Holder, the prevailing party in such action, or the nondismissing party when the dismissal occurs other than by a settlement, shall be entitled to recover its reasonable costs and expenses, including without limitation reasonable attorney fees and costs of defense paid or incurred in good faith. The "prevailing party," for purposes of this Agreement, shall be deemed to be that party who obtains substantially the result sought, whether by settlement, dismissal, or judgment.

10.11. Assignment. This Agreement shall inure to the benefit of and be binding on the parties to this Agreement and their respective successors and assigns. Buyer shall have the right to assign all or any portion of its interest in this Agreement, provided that Buyer gives written notice of such assignment to Seller before the Closing Date.

10.12. No Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it and their respective permitted successors and assigns, nor is anything in this Agreement intended to relieve or discharge any obligation of any third person to any party to this Agreement or give any third person any right of subrogation or action over against any party to this Agreement.

10.13. Remedies Cumulative. The remedies set forth in this Agreement are cumulative and not exclusive to any other legal or equitable remedy available to a party.

10.14. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.15. Tax-Deferred Exchange. Seller may use the proceeds from the sale of the Property to effect one (or more) tax deferred exchange under Internal Revenue Code §1031. Buyer agrees to accommodate Seller in effecting such tax-deferred exchange. Seller shall have the right, expressly reserved here, to elect such tax-deferred exchange at any time before the Closing Date. Seller and Buyer agree, however, that consummation of the purchase and sale of Property under this Agreement is not conditioned on such exchange. If Seller elects to make a tax-deferred exchange, Buyer agrees to execute such additional escrow instructions, deeds, documents, agreements, or instruments to effect this exchange, provided that Buyer shall incur no additional costs, expenses, or liabilities in this transaction as a result of or in connection with this exchange. Seller agrees to hold Buyer harmless of any liability, damages, or costs, including reasonable attorney fees, that may arise from Buyer's participation in such exchange.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

SELLERS:


LESLIE K. SHIPNUCK
HORTON-SHIPNUCK LIVING TRUST

by: DAVID E. SHIPNUCK, Trustee *OF THE HORTON-SHIPNUCK LIVING TRUST, UAD 07/18/2000, SPH*

BUYER:

GREENWOOD REVOCABLE TRUST

By: *Elizabeth Greenwood*
Trustee


P&SA-rev
6/8/05km

EXHIBIT "A"        A.P.N. 126-011-145
20425 Eighth St. East, Sonoma, CA 95476

Improved real property in Sonoma County, California, more particularly described as follows:

All that real property situate in the County of Sonoma, State of California, described as follows:

Lots Number Ten (10) and Eleven (11) as shown upon the Map entitled "Map of McGaws Subdivision of the Gordon Tract, being portions of the Out Lots 527, and 532 near the City of Sonoma, Sonoma County, California," filed in the office of the County Recorder of Sonoma County, State of California, on February 14th, 1912, also Out Lot Numbered 538 in the former Pueblo or ex-City of Sonoma; in the said County of Sonoma, State of California, as the said Out Lot is known, numbered and designated on the official Map or Plat of said former Pueblo or ex-City of Sonoma now of record in the office of the County Recorder of said County of Sonoma.

Also that certain narrow parcel or strip of land, (formerly a street), lying, being and extending between Out Lots Nos. 538 and 533.

Reserving from the said property so conveyed, all the property, conveyed by George Von Staden, to M. L. Gillogly, right of way Agent Northwestern Pacific Railroad Company by deed dated June 4th, 1917 and recorded in the office of the County Recorder of said County of Sonoma, State of California, on the 8th day of June 1917, in Liber 351 of Deeds at Page 355.

EXCEPTING therefrom that portion of the property conveyed to the County of Sonoma, State of California, by deed recorded on September 28, 1983, described as follows:

Lying within the Huichica Rancho and being a portion of the lands of Bernard B. Shipnuck and Ethel G. Shipnuck as recorded in Book 594, Official Records, Page 449 and being more particularly described as follows:

Beginning at the southwest corner of the said lands of Shipnuck marked by a ½" iron pin inside a ½" iron pipe from which Engineer's Station 58+53.45 P.O.T. as shown on a map entitled "Napa Road" dated February 1982, and on file in the Office of the Sonoma County Surveyor bears S 7° 38' 27" W 28.04 feet, thence from said point of beginning and along the west line of the said lands of Shipnuck in a northerly direction to a point from which Engineer's centerline bears S 7° 38' 27" W, 50.00 feet; thence leaving said west line S 82° 21' 33" E, 131 feet, more or less, to a point from which Engineer's Station 59+84.86 Angle Point bears S 7° 40' 08" W, 50.00 feet; thence S 82° 18' 11" E, 665.16 feet to a point from which Engineer's Station 66+50 P.O.T. bears S 7° 41' 49" W, 50.00 feet; thence S 65° 36' 15" E, 52.20 feet to a point from which Engineer's Station 67+00.00 P.O.T. bears S 7° 41' 49" W, 35.00 feet; thence S 82° 18' 11" E, 166.17 feet to a point; thence curving to the left with a radius of 25.00 feet through an angle of 90° 25' 53" for a distance of 39.46 feet to a point; thence N 7° 15' 56" E, 124.81 feet to a point; thence N 9° 06' 59" E, 110.00 feet to a point; thence N 31° 00' 55" E, 48.94 feet to a point on the easterly line of the said lands of Shipnuck from which the northeasterly corner of the said lands of Shipnuck marked by a ½" iron pipe monument bears N 7° 18' 40" E, 695.83 feet; thence along said easterly line S 7° 18' 40" W, 311.71 feet to the southeast corner of the said lands of Shipnuck from which Engineer's Station 69+14.61 P.O.T. bears S 7° 18' 40" W, 28.20 feet; thence along the southerly line of the said lands of Shipnuck S 82° 19' 07" W, 1060.99 feet to the point of beginning.

EXHIBIT A

# EXHIBIT B

(Extension Agreements)

## EXTENSION AGREEMENT

The undersigned as the parties to that certain Purchase and Sale Agreement for the real property known as 20425 Eighth Street East, Sonoma, CA 95476, dated June 10, 2005, hereby agree as follows:

1. The "contingency date" specified in Paragraph 3.2 of the agreement shall be extended seven (7) months to, and including, May 10, 2006.

2. As consideration for this extension, Buyer shall pay the sum of $12,500.00 to the Seller, in advance, each month on the 10th day of the month commencing October 10, 2005, in the form of a check in the amount of $6,250.00 to each of the individual Sellers.

3. The consideration for the extension shall be payable during the term of this agreement, or until the Buyer elects to terminate the agreement pursuant to its terms.

4. The consideration is in addition to any purchase price specified in the agreement and shall be paid directly to Seller and not through escrow.

Dated: 10·4·05

Seller: Leslie K. Shipnuck


Seller: Horton-Shipnuck Living Trust,
David E. Shipnuck, Trustee

Dated:

Buyer: Greenwood Revocable Trust
By:
Trustee

[ksm-283-05]

## EXTENSION AGREEMENT

The undersigned as the parties to that certain Purchase and Sale Agreement for the real property known as 20425 Eighth Street East, Sonoma, CA 95476, dated June 10, 2005, hereby agree as follows:

1. The "contingency date" specified in Paragraph 3.2 of the agreement shall be extended seven (7) months to, and including, May 10, 2006.

2. As consideration for this extension, Buyer shall pay the sum of $12,500.00 to the Seller, in advance, each month on the 10th day of the month commencing October 10, 2005, in the form of a check in the amount of $6,250.00 to each of the individual Sellers.

3. The consideration for the extension shall be payable during the term of this agreement, or until the Buyer elects to terminate the agreement pursuant to its terms.

4. The consideration is in addition to any purchase price specified in the agreement and shall be paid directly to Seller and not through escrow.

Dated:

Seller: Leslie K. Shipnuck

11/15/05

Seller: Horton-Shipnuck Living Trust,
David E. Shipnuck, Trustee

Dated:

Buyer: Greenwood Revocable Trust
By:
Trustee

[ksm-283-05]

Elizabeth G. Frazier

## MODIFICATION OF EXTENSION AGREEMENT

The undersigned as the parties to that certain Purchase and Sale Agreement for the real property known as 20425 Eighth Street East, Sonoma, CA 95476, dated June 10, 2005, hereby agree as follows:

1. The Extension Agreement executed by the parties on or about October 4, 2005 is amended by this agreement.

2. The contingency date specified in paragraph 3.2 of the Purchase and Sale Agreement shall be extended to the completion of an election for annexation of the subject property to the Sonoma Valley Sanitation District, plus thirty (30) days. This election must be completed in 2006. At the expiration of that time, Buyer shall pay a non-refundable payment of Two Hundred Twelve Thousand Five Hundred Dollars ($212,500.00). Upon payment of that additional consideration, Buyer shall receive a further extension of one (1) year. In no event would the added consideration be payable later than December 15, 2006.

3. The purchase price at the close of escrow shall be Three Million Eight Hundred Thousand Dollars ($3,800,000.00), without credit for the payment in the amount of $212,500.00 and without credit for payments made under the prior Extension Agreement executed by the parties.

Dated:_____

_____
Seller: Leslie K. Shipnuck

Dated:_____

_____
Seller: Horton-Shipnuck Living Trust,
David E. Shipnuck, Trustee

Dated: 1-28-06

_____
Buyer: Greenwood Revocable Trust
By: Elizabeth G. Frazier, Trustee

[ksm-283-05]

# EXHIBIT C

(Assignment)

# LETTER OF ASSIGNMENT

THIS LETTER OF ASSIGNMENT shall serve as written notification and authorization of the transfer of interest in that certain Purchase and Sale Agreement dated June 10, 2005 between David E Shipnuck, as trustee of the Horton-Shipnuck Living Trust under agreement date July 18, 2000, and Leslie K Shipnuck, an individual, (collectively referred to as Seller) and the Greenwood Revocable Trust, so belonging to the undersigned the Greenwood Revocable Trust to the named Assignee. The transfer to be full, absolute and permanent as set forth. From the effective date of said assignment, it is the Assignor's desire that the Assignee shall become the substitute Purchaser.

SAID ASSIGNMENT OF INTEREST shall be made to ELIZABETH G. FRAZIER, TRUSTEE OF THE ELIZABETH G. FRAZIER REVOCABLE TRUST, dated January 9, 2004 (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) at 17564 7th Street East, Sonoma CA, 95476.

SAID ASSIGNMENT OF INTEREST Shall be effective on December 1, 2005

GREENWOOD REVOCABLE TRUST

_____
Elizabeth G. Frazier, Trustee

I, the undersigned ELIZABETH G. FRAZIER, TRUSTEE OF THE ELIZABETH G. FRAZIER, REVOCABLE TRUST, dated January 9, 2004 (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), do hereby agree to accept the Assignment of Interest in the above described Purchase and Sale Agreement. This Assignment to be effective on December 1, 2005.

ELIZABETH G. FRAZIER
REVOCABLE TRUST

_____
Elizabeth G. Frazier, Trustee

# EXHIBIT 3

OWENS, CLARY & AIKEN, L.L.P.

ATTORNEYS AND COUNSELORS

SUITE 1600

700 NORTH PEARL STREET

DALLAS, TEXAS 75201

(214) 698-2100

E-MAIL: wcreasey@oca-law.com

DIRECT DIAL
214-698-2113

FACSIMILE
(214) 698-2121

December 14, 2006

*Via Federal Express*

Ms. Denise Mucci
First American Title
561 First Street West
Sonoma, CA 95476

      RE:     Assignment of Purchase and Sale Agreement Dated June 10, 2005 Between David E. Shipnuck, as Trustee of the Horton-Shipnuck Living Trust under Agreement dated July 18, 2000 and Leslie K. Shipnuck ("Seller") and Greenwood Revocable Trust, as amended (the "Contract")

Dear Ms. Mucci:

      In connection with the Assignment by Elizabeth G. Frazier Revocable Trust (the current holder of the Contract) ("Assignor") to Cirrus Exploratory Sites, LP ("Assignee"), on behalf of Assignee we are enclosing, on behalf of Assignee, three counterparts of the following documents executed by Assignee:

      1.     Agreement Regarding Contract;

      2.     Development Agreement; and

      3.     Assignment of Purchase and Sale Agreement ("Assignment").

      Our client is wire transferring to your escrow account the sum of $212,500.00 to be disbursed to Seller upon the occurrence of the following:

      1.     Receipt by you of a counterpart of each of the foregoing documents executed by Assignor;

      2.     Receipt by you of a counterpart of the Assignment executed by Seller; and

      3.     Receipt by you of instructions from the undersigned or a representative of Assignee to disburse and distribute the documents.

OWENS, CLARY & AIKEN, L.L.P.

Ms. Denise Mucci
December 14, 2006
Page 2

Upon your receipt of the foregoing documents and funds, you are instructed to hold the same in escrow, notify me by e-mail and await further instructions from me or from a representative of Assignee.

If you have any questions concerning these instructions, please notify me immediately.

Please evidence your agreement to the foregoing by signing and returning a copy of this letter to me.

Yours truly,

William R. Creasey

Agreed to and Accepted as
of December ___, 2006

FIRST AMERICAN TITLE

By: _____
        Denise Mucci, Escrow Officer

WRC/ph
Enclosures

cc:    Mr. Nathan Golik (via e-mail)
       Mr. Henry Grause (via e-mail)
       Ms. Nedra Leach (via e-mail)
       Robert L. Owens, Esq. (via e-mail)

06400.201/L01

# EXHIBIT 4

THE LAW OFFICES OF JOHN A. KELLY

414 First Street East, Suite 7 · Sonoma, California 95476
707-935-6100 · Fax 707-581-7470 · www.law-kelly.com

*john@law-kelly.com*

OF COUNSEL
Kenneth S. McTaggart

February 14, 2007

William R. Creasey, Esq.
Owens, Clary & Aiken, LLP
700 North Pearl Street
Suite 1600
Dallas, Texas 75201

Dear Mr. Creasey:

I represent Mr. David E. Shipnuck, trustee of the Horton-Shipnuck Living Trust under agreement dated July 18, 2000. I also represent Mr. Leslie K. Shipnuck. Collectively, in your letter of December 14, 2006, you referred to them as the "Sellers," a nomenclature adopted for purposes of this letter. I am writing to you today concerning a document entitled "Assignment of Purchase and Sale Agreement," provided to me by First American Title in Sonoma, California, that requires an acknowledgment and agreement by the Sellers to certain specific items which, while innocuous, have required a certain amount of detail work to ensure that the Sellers can, indeed, acknowledge, agree, represent, and warrant as indicated.

My review of the document in question indicates the following:

(i) attached as Exhibit A is a true, correct and complete copy of the Contract;
(ii) the Contract is valid and in full force and effect, with one issue;
(iii) the Contract has not been modified, amended or altered in any way, except as provided by the extension agreements, but there is a related issue;
(iv) Assignor is not in default under the Contract; and
(v) there are no other parties in possession of the property, except for two month-to-month leases, although there is a related issue.

The Sellers are prepared to acknowledge, agree, represent, and warrant that Exhibit A is a true and correct copy of the Contract, with certain exceptions. The obvious exception relates to item (iii), for the Contract has been modified, amended, and altered as provided by the extension agreements. However, the Sellers also note a discrepancy between Exhibit A, which indicates that the property is approximately twenty-four (24) acres, and the true size of the property, which is closer to twenty-two (22) acres.

February 14, 2007

The Sellers are also prepared to acknowledge, agree, represent, and warrant that the Contract is valid and in full force and effect, and that Assignor, the Elizabeth G. Frazier Revocable Trust Dated January 9, 2004, is not in default, with one issue pending. It appears that the terms of the second option agreement required payment by December 15, 2006, and while Cirrus did deposit money on the 14th, it does not appear that the precise terms of the option were met by that deposit. Having said that, the Sellers are prepared to waive that breach, subject to the condition set forth below.

It has come to the attention of the Sellers that the City Attorney of the City of Sonoma has taken a particular position concerning the proposed ballot measure by Cirrus that has a certain unanticipated effect on the Sellers' property. It is apparently the City Attorney's position that, if the measure passes, at any point in the future that the Sellers' property might be annexed, that the City of Sonoma would be bound to only allow development of the property that qualified as a "medical campus" at that site, absent a second vote of the citizens of Sonoma. The reason this matters is that, should the Cirrus ballot measure pass, but should Cirrus then not execute their option, the Sellers' property would still remain bound by the "medical campus" provision of the proposed ballot measure if it were ever annexed to the City, which would substantially diminish the property's value.

The current nature of the option is roughly analogous to a "call" option; the holder has the right, but not the obligation, to purchase the property. Given that the value of the property will be substantially diminished should Cirrus obtain passage of the proposed urban growth boundary amendment, but then not follow through on a purchase, it is the Sellers position that, should the Cirrus measure pass in an election, that the option should then have the characteristics of a "put" option, in that the Sellers would have the ability to require Cirrus to purchase the property. As noted above, the Sellers are prepared to waive the above-noted breach subject to this modification.

Finally, in regards to item (v), on one edge of the property, the neighbor, Mr. Art Fichtenberg, has constructed a vineyard such that the perimeter road has encroached onto the Shipnuck's property, and resulted in a change to the drainage pattern in that area. Mr. Fichtenberg has indicated he is willing to sign the attached document, which reflects the fact that he asserts no adverse rights to the lands of the Shipnucks, and documents the existing situation on that edge of the property. However, we have not yet been able to obtain his signature.

With the exception of these issues, the Sellers are prepared to acknowledge, agree, represent, and warrant, as indicated. If this will prove acceptable to your client, please let me know as soon as is reasonably possible.

February 14, 2007

Very Truly Yours,

John A. Kelly

cc:  Leslie Shipnuck (via electronic mail)
     David Shipnuck (via electronic mail)
     Isaac Raboy (via electronic mail)
     Dr. Henry Grause (via electronic mail)
     Denise Mucci (via electronic mail)

JAK/ggk